Case number 17-5850, Sue Smith v. LHC Group Inc, et al., or LHC, 15 minutes per side. Mr. Robert Abel for the public. May it please the court, my name is Robert Abel, I represent the appellant, Sue Smith in this case. Your Honor, if I could reserve three minutes for my rebuttal remarks. This case is an employment case. It comes to the court with a quite limited record, the district court having granted the defendant's motion to dismiss. There are basically two claims with three issues, but let me talk first about Ms. Smith. The record is limited, and I think it might be helpful to start with the nature of her duties. The defendant is a home health care agency, so it provides home health care services of a variety to persons needing that. She was their director of nursing at the Lexington, Kentucky office. Her duties dealt with running that program, but let me talk about how it would start. It would be a referral from a nursing home, a doctor's office, a hospital, a health care facility for a patient who's called John Doe. Mr. Doe may need a number of different home health care services, such as skilled nursing, physical therapy, and speech therapy. So they get a referral, we have a potential patient here, Mr. Doe, he needs these three types of services, according to what the information the doctor has sent us to. An initial assessment has to be made. Are we in a position, given our staffing and the rest of our patient load, to even think about being able to provide these to Mr. Doe? In some cases, the answer would be no, but they could be. Then the second step is a clinical assessment. Someone goes, an appropriately skilled clinician goes to Mr. Doe's residence or the site where the services will be provided. And determines, really makes them more particularized in further inquiry. Does this patient really need these services? Is this an environment in which they can be effectively provided? Was that Ms. Smith's job to do that evaluation? Other clinical personnel typically would do that. And they would, in turn, report back to her, Mr. Doe, upon meeting him, needs a degree of skilled nursing care that's, let's say, extraordinary. So I was a little bit confused what exactly Ms. Smith did in her job function that might involve her feeling complicit in what you assert is the wrongdoing, the False Claims Act, the fraud. I'm building to that. Okay, I'm sorry. I want to get to it. But the assessment is made and the report comes back to Ms. Smith. It'll work. We can, let's say, he needs a degree of skilled nursing care that's extraordinary, because there can be levels of that, of course. And she, at that point, was empowered to accept, make a decision, we can accept Mr. Doe as a patient because we can adequately provide what we determined his services are. And in some instances, the clinical assessment may determine, you know, Mr. Doe really doesn't need physical therapy to the extent ordered, and confer with the health care provider and some to-and-fro, but going back in this. But Ms. Smith was empowered to make a decision to accept the patient. She was not, however, empowered to make a decision, we can't accept Mr. Doe as a patient. She could note that, but that ultimate decision went to her higher-ups. She knew that they were doing, she was told that they were making $6 million out of taking these patients, and she was aware of that fact, I take it. Yes, Your Honor, and this, I'll answer both that question and Judge Moore's question earlier. And at this point, this is where it intersects. It came to her attention and her knowledge that patients were being accepted in a way in which the clinical assessment had been suspended. Your point is that having that knowledge about the employer would make her complicit in the cover-up of illegality and overcharging the government, is that right? Yes, Your Honor. Okay, that's the point, right? Yes, a decision to be made. Well, nevertheless, even though the doctor's orders had been manipulated, rather than the three services, for instance, that were initially ordered, which were not in a position to provide, the orders were manipulated down to just two types of services. But did she have to sign anything or say anything or do anything that was not truthful herself? Possibly. At that point, a patient is accepted. Okay, it's part of her patient load. She's required to administer the staff, to assign to people that she's made a legitimate determination are appropriate, and to persons that she believes may be in danger because they're not getting the services they need because the orders have been changed in a way that certainly looks suspicious, at least. Ultimately, as part of this, the services are provided, are represented to be adequate, necessary, and proper services that have been provided. And most importantly here, we're entitled to be paid, and that's where this intersects with her. She sees that the staff personnel are assigned to the patients that have been wrongfully enrolled as a patient, and the payment process touches on her job responsibilities as well. She brings this up. She would have knowledge of and complicit in the company she's working for's basically fraudulent conduct. Yes, it would intersect on pretty much a day-to-day basis with her routine duties in terms of assigning staff, determining whether or not another patient should be accepted, because keep in mind we've got staff on hand that are being assigned to take patients that shouldn't have been accepted to begin with. So in your hypothetical where a doctor ordered three services and the defendant is providing two different additional services that weren't ordered, she would be assigning staff to meet her employer's needs as opposed to what the doctor had certified was needed. That would be correct, because that was part of her duties as director of nursing, to manage, schedule, hire the clinical staff, speech therapists, physical therapists, occupational therapists that provide this type of care. Okay, so your claim on the False Claims Act is a constructive discharge claim, that she quit her job because she did not want to be complicit in the fraud of the defendant. That's correct. And we, well, the district court ruled in these circumstances, this isn't a constructive discharge. And the basis for the court's ruling... Excuse me just a second. Did you allege anything in your complaint of any specific instance where your client had to participate or had any involvement in an assignment of personnel to a matter that was a false claim? I think paragraph, I believe it's 25, where we specifically mention a patient who's referred to as the initials of F.A. F.A.? F.A., yeah. And we did provide some examples of the type of manipulation or alteration of the patient intake process that was performed and is what led Ms. Smith to act. Now, our argument regarding the constructive discharge is that the district court misapplied the standard. This court has said you need to look at the facts of each case focusing on the employer's intent and the reasonably foreseeable impact of the employee's conduct, excuse me, the employer's conduct, and that intent can be shown that demonstrating that quitting was a foreseeable consequence. And I think the district court kind of agreed with us on this because the district court observed Ms. Smith was put in a situation of get along or go along or quit. An employee that reports what frankly appears to be health care fraud and is basically told, thank you very much, but we're making a lot of money off this. And I'm not representing to the court she was told or threatened or anything like that, but basically, thank you. Is there anything else? Have a good day the rest of the day. Do you have a case, though, that says that that's enough for a constructive discharge? Because the typical constructive discharge case is where the employer wants to get rid of the employee and makes the workplace so intolerable that the employee says, I've got to leave. No, and I'm really not surprised, Your Honor, that there's a paucity of authority on the type of context here. This court in Logan identified seven different factors that could, you know, badgering, harassment, or reassignment to work under a younger supervisor. I'm asking the court to conclude that if reassignment to work under a younger supervisor is a punitive enough action to cause a constructive discharge, being compelled to work in a situation where your day-to-day work duties cause you to intersect and, frankly, facilitate to some degree health care fraud, and you choose, I'm not doing that. It's a crime to facilitate if she's got knowledge that it's going to, that they're defrauding the government. I would have a very weak argument, Judge Merritt, if this were a criminal case, maybe health care fraud under 1067. But I'm in prison of a felony. Isn't it true, Abel? I'm not reporting on a felony that you know about in your work. A question could be, is this the right claim for someone in her shoes to be making a constructive discharge claim, or are there other claims under the False Claims Act, where a whistleblower, for instance, reports? The Quintam action would be something that would lie under these circumstances as well. Right, because clearly a worker should be protected against having to work under situations where the worker is complicit in unlawful activity of the employer. If you were trying to design a system of rights and responsibilities, that would seem to be wrong. Well, the False Claims Act gives a, it's very broad in my reading to the protection for the employee that if they make an effort to stop the practice that they see as improper, then, and they're a younger supervisor, but in this instance they are as a result constructively discharged. They have a claim under the Anti-Retaliation Provisions, which is what count one is. But I see my time is up. We have your rebuttal time. Thank you. Good morning. May it please the court, I'm Glenn Patton with Alston and Byrd. I represent the defendants in this case, LHC Group and Kentucky LV. I'm first going to address the dismissal of the plaintiff's retaliation claim under the False Claims Act, and then time permitting I'll turn to the dismissal of the plaintiff's wrongful discharge claim under Kentucky law. I want to start with a fairly basic observation because I don't think in that entire 12 minutes the word retaliation was ever even used. Judge Moore, I think you were getting at this with your comment there at the end, is that this claim was brought under a retaliation theory. This is not a key tam case. This is a retaliation case. And the gravamen of any retaliation claim is that the employee in the case engages in protected activity by making a complaint, and then the employer retaliates against that individual for making that complaint and trying to punish the employee for raising those concerns. And the fundamental flaw in this case, as Judge Caldwell recognized, is that the plaintiff does not allege even one allegation in that complaint that suggests that the company ever took any action whatsoever against the plaintiff after she complained about these patient intakes. Is she supposed to continue to work at a company where she knows that the company in the work that she is doing but is defrauding the government? Two points, Your Honor. First, it's not the work that she was doing. She is very clear in pleading. What she's got is knowledge of what is happening at this company. And we're supposed to say that that's fine? No, you're not supposed to say that's fine. But there is a remedy. If I could, I'll answer your question. You have many options available to her. She could have said, I'm not going to be involved in this behavior and stayed. She could have, I think at some point in the brief it's suggested that they bypassed her in this process. She was not intimately involved. She could have reported it to the government, that's for sure. She could have reported it to the government and stayed employed and said, and that way she's covered, I'm not complicit in this, I've taken it, I've complained to the federal government. Or she could have quit and then tried to sue under the QTAM provision. But that's not what happened here. You said she could have stayed at the company and refused to do the work that made her complicit. Is that what you're saying? And then if she were fired by them. That's exactly what I was getting at, yes. But I still take issue with the threshold notion that she was involved in this wrongdoing. The paragraph 21 of the complaint is very clear, that others were responsible for making the decisions about whether to accept the patient or not. She was not. Her only responsibility was to, after the patient was accepted, to assign the therapists to go out and visit the patient. But she was engaged in a process by which this was taking place. And she knew about it. There was no question about that. I mean, you're advocating that employees work and continue to work for a company that's defrauding the government and the taxpayer and do nothing. I'm not advocating for anyone to do nothing. I'm certainly not advocating that anybody participate in Medicare fraud on the government. All I'm arguing is that we're here to talk about whether the plaintiff can state a claim for retaliation under a retaliation theory and a retaliation statute, and there is not a single act of retaliation anywhere alleged in this complaint. The plaintiff acknowledges that. He said it just a minute ago. She was never threatened. No one ever said anything to her. Looks like to me it's a constructive discharge if you're going to. Well, maybe I could address that, Your Honor, the constructive discharge piece. The constructive discharge piece doesn't get her out of showing that the company did something to her. All it does, the constructive discharge, it's a doctrine that's intended to where the employer, and again it's a retaliatory constructive discharge claim that we're talking about here, is that even though the employer didn't officially terminate or cut her pay or take some other overt retaliatory action, the employer went about creating these, did a series of things leading up to termination that made the whole circumstances in the work environment so utterly intolerable that a reasonable person would have felt compelled to resign. So the person for a constructive discharge theory still needs to point. She did feel compelled to resign, didn't she? She felt. She did resign. But not because of any retaliation. This is the reason she gave, isn't it? But not because of retaliatory actions by the employer. She made her own value judgment that after six years, I didn't want to work there anymore. Because they're crooked. That's actually, well, we can't really get into that. The record is what the record is about that. She did not leave because of this. That's all I'll say on this, and there's a resignation letter that makes clear that she did not leave because of this. But we can't argue about that because it's not in the complaint, and I certainly can't show you that five-page letter. This is a motion to dismiss. That's correct. So we only have the complaint, right? That's what we look at. Okay. Right. So, again, the constructive discharge does not eliminate the prong of the prima facie case that says that she has to show that an adverse action was taken against her. All it is is a substitute for a termination claim by saying the employer did X, Y, and Z. For example, if she had raised these concerns about the patient intake procedures and they had changed her job title, cut her pay, moved her desk, and put her in the basement in retaliation because she made a complaint, then maybe Mr. Abel would have an argument that the totality of those circumstances, those retaliatory actions that were taken by the employer, were sufficient to create. . . Can't you have a constructive discharge without having a single act of retaliation? No. You cannot. You cannot. There is not a single . . . You have to continue to work for the company that's stealing from the government. Is that right? Your Honor, for a retaliation theory, for a retaliatory constructive discharge theory, there has to be actions taken by the employer against the individual. Every single case that's been cited by either party in any of their briefs and the underlying summary judgment briefs involves actions specifically taken to isolate, ostracize, harass, and discriminate. Every day she works down there because she's got knowledge of what they're doing in the way of stealing money from the government and she's not reporting it to the government or saying anything about it, and that's misprison of a felony. Why didn't she complain to the government? She left. She quit without the employer having done anything to her that would be retaliation for having raised a complaint. She quit because she was being associated with a company that was stealing from the public. Well, let me try and address your concern on that. So where is the limit? Does everybody in the company get to . . . Does everyone at that branch of the agency get to quit and claim constructive discharge and run into federal court and sue on their individual constructive discharge claim? Case by case with their knowledge. You would have to look at the knowledge of the person. It was not her responsibility to approve these patients. Others were responsible for approving the patients. What was her job? She was the director of nursing. We have to go with what's in the complaint. Right. What I was trying to get at with your opponent and what I'm now trying to get at is was the nature of her job such that what she would be doing in the regular course of her duties would make her complicit in what she alleges is the wrongdoing that the company was involved with? No. And again, paragraph 21 is explicit. She says she has never participated. She makes clear in numerous paragraphs of the complaint that she never participated in any of the wrongful conduct. She never alleges, and this is very important for the state law claim, never once alleges that she was asked or told that she needed to participate in this conduct. She just learned of it because when a patient got enrolled, she would be copied on emails that so-and-so was enrolled because she had to then find out a therapist and get a therapist assigned to provide the services that were approved. But then wouldn't she be involved with providing services to someone who wasn't certified to need those services? That's an important distinction about what the allegation here is. There's no allegation that there was a provision of services that were not required by the doctor's orders. The only allegation in this complaint is that perhaps there was a referral for PT and OT services and that if the company didn't have a PT person available and only had an OT person available, that the company would ask the doctor to write the orders for only the OT. That's the allegation. That gets to the whole issue of whether there's anything resembling fraud on the government, even if you accept everything in this complaint as true, is that she was assigning a therapist to provide services that were pursuant to a doctor's orders. There was no addition of services. There was only the deletion of services under those circumstances where the company did not have adequate staffing available to provide the additional services. Is that the allegation in paragraph 25? Yes. I think there's a number of allegations in the complaint, all of which describe the removal of services. There's not one allegation that's suggesting that additional services, that this was a case where the company was trying to pump up and get additional money out of the government for services that were not required by the patient or by the doctor. I guess I would just want to finish off the thought here that essentially if you accept that this case can move forward without even a single allegation that the employer actually did anything to retaliate against her for making that complaint, then you've effectively eliminated the third prong of the prima facie case. In every single case, a plaintiff can bring an FCA retaliation claim simply by alleging that I made a complaint, the employer was aware of the complaint, and then nothing else has to happen to the plaintiff. Then there's a retaliation claim in every single circumstance. And that's not supported by even one case that the plaintiff has cited. You asked him if there was any cases. He acknowledges that there is not. And on top of that, we pointed the court to the Seventh Circuit's decision in Absher v. Moments Meadows Nursing. And in that case, the facts are strikingly similar. There was a nurse there at a nursing home. She was very upset about what she perceived to be substandard care practices that were going on at the nursing home facility, very serious violations of dirty catheters and other things, and that she quit after she complained, her complaints were ignored, and a patient died. And she quit under those circumstances. The Seventh Circuit looked at this case evaluating an FCA retaliation claim and she claimed a constructive discharge just like Ms. Smith. And in looking at that case, that set of facts, the Seventh Circuit rejected any claim for constructive discharge under the FCA's retaliation provision, and there were two bases for the holding. It said, first, there was no evidence that the employer did anything to make her employment unbearable, which is what we have in our case. And it said, the quote is, there's no evidence that the employer, quote, did anything to make her employment unbearable, despite ignoring Unless you want to participate in a cover-up of illegal conduct. I mean, that's about all you... Okay, and then the second portion of their holding in the Absher case, which is on all fours with our case, is that Absher is not contending that Moments provided the substandard care in order to push Absher to resign. Again, what the court is doing in the Absher case is appropriately focusing on that this is a retaliation claim. This is not a key TAM case. She can quit and sue under a key TAM provision and try and recover money for all of this, but she can't sue under a retaliation provision in a case where there is not one single shred of allegation, much less evidence, that she was retaliated against, that the company did anything because she complained. There is not a single case out there under FCA retaliation that allows a case to roll forward without even an allegation that there was an adverse employment action taken against her because she complained. So if there aren't any more questions on the federal claim, I'll try to address briefly with my 2 minutes and 40 seconds the state law claim. The state law claim was dismissed because the court found that there had been no affirmative request that she violate the law. Is that clear that that's what the law of the state is? Well, it's interesting that you ask that. I believe it is. If you read the Supreme Court's decision in Kentucky v. Hill, and the site on that is 327 Southwest 3rd 412, and this is a Kentucky Supreme Court case from 2010, it was specifically evaluating and describing the contours of this wrongful discharge claim, and it said there would be no basis for a common law wrongful discharge claim if there was no request for the perjured testimony. That's coming directly from the Kentucky Supreme Court. And then there's the Welsh decision as a Kentucky Court of Appeals case, which expressly says, to avoid any uncertainty, that to be clear you have to allege that there was an affirmative request to violate the law. I thought Welsh is, first of all, not published, and secondly, it's been sort of questioned. I don't believe it's been questioned. I think the panel in the Alexander case noted that on appeal to the Kentucky Supreme Court, the Kentucky Supreme Court indicated that it shouldn't be published. That's it. And so if I might, with my time remaining, let me just address the Alexander decision because I think it's important. First of all, any suggestion about this inevitable complicity, the panel did not hold that that's the standard. It simply tried to give the benefit of the doubt to the plaintiff in that case by looking at it on a broader level and said, even if we excuse you from showing an affirmative request and we think about this inevitable complicity, it did not hold that that's the standard. And I would argue that they didn't even follow their own admonitions, which is to first look to the Kentucky Supreme Court, the Alexander indicta. Their dicta suggestion that there's a broader standard ignored the passage I just read to you from the Hill case, didn't even address it. It also said up front that we're given a choice between an interpretation that restricts or expands liability, we should choose the narrower interpretation, yet it didn't do that. But I would argue that the Alexander case, even if you give it the broad interpretation and say is there some evidence of inevitable complicity, that Alexander decision does not support a finding that she stated to claim on the facts of this case. The facts in Alexander were much more egregious than the facts of this case. There was expressed wrongdoing by the employees, the individual was responsible for directly signing off on the certification of the engines as not being defective and refused to it and then was terminated. And on that set of facts where it was inevitable that this person was going to be signing off on it, the panel in Alexander specifically said the tort of wrongful discharge is not broad enough to cover the facts that have been alleged in this case. Thank you very much. Your Honors, I think Mr. Patton's remark regarding Apsher, the Seventh Circuit case, are helpful because it draws a contrast. The plaintiff there, Apsher, was a nurse who, from what we can tell from that opinion, very conscientiously worked and provided, for what we can tell, adequate care to the patients that she was taking care of. She was disappointed that, on the whole and in the main, her company was, for most of the patients, not providing that level of care, not providing an appropriate level of care, and that discouraged her and she quit because she didn't wish to be associated with that. The difference between her situation and Ms. Smith's situation is that the wrongdoing in Ms. Smith's work environment intersected with her day-to-day job responsibilities. Apsher, there's no indication that the company's policies caused her to provide poor care. From what we can tell from that opinion, she did just fine and her patients were lucky. Wasn't there an intersection in the Alexander case, though, under the state law? Alexander, I gathered, it did not appear to be a regular practice of the wrongdoing. Let's just call it that, if I may, Judge Bush. It did not appear to be a regular practice. Apparently it was isolated. Here it was an established practice that did regularly intersect with Ms. Smith's job duties. Well, the court said even if the illegal activity was systematic, any future act of signing off on the defective engine blocks would not have made Alexander automatically complicit in this illegal activity. He wasn't responsible for signing off on them. He was aware that a colleague was signing off inappropriately, and he had brought that, I think, to Human Resources or some appropriate personnel in the company, and he had suffered punitive action in response to that. But he wasn't, unlike Ms. Smith, responsible for signing off. Where does the complaint say Ms. Smith is responsible for signing off on fraudulent matters? Paragraph 10 defines her duties, administrating and ultimately signing off on reimbursement requests to Medicare and Medicaid and private insurance as well. It's a very general summary of her job duties. But she, I think Mr. Patton acknowledged part of her job duties once patients were accepted was to assign staff. So that's intersecting with her duties. And she has acknowledged some of these patients we should not have accepted. We're not meeting their needs because we have wrongfully reduced their needs to fit our needs. They're intersecting with them there. Let me ask you a question. Your red light's on here, and I've been waiting to ask this question. Mr. Patton's point seems to be that there's got to be an express act of retaliation in order to meet the test for a constructive discharge and that you don't have any case law of any kind that would undermine the necessity for retaliation. What's your response to that? On pages 13 and 14 of the main brief, this court, the existence of constructive discharge depends on the facts of each case and requires an inquiry into the intent of the employer and reasonably foreseeable impact of the employer's conduct upon the employee. That's from this court's decision in Smith v. Henderson. The plaintiff can show the appellee's intent by demonstrating that quitting was a foreseeable consequence of the employer's actions, and that's from this court's decision in Moore v. Kuka Welding. An employee who reports wrongdoing and is essentially, as here, told, thank you very much, but we're really making a lot of money off that. Let's talk about how we're going to keep this going, is put in a situation by the employer's actions where the foreseeable consequence, and frankly the only reasonable consequence, is for the employee to quit the employment. So I ask the court to reverse, and I don't think this is clear in the briefs, count one and count three, reverse and send those back for further proceedings. Judge Caldwell was correct with regard to count two, and I'm not asking for any relief on that. Thank you. Thank you both for your argument. Very interesting morning. The case will be submitted, and would the clerk adjourn court, please? This honorable court is now adjourned.